Jones, J.
We hold that the provisions of subdivision 3 of section 205 of our State’s Disability Benefits Law do not operate to shelter employment practices in the private sector *86 that would otherwise be impermissibly discriminatory under our Human Rights Law. The imperative of the latter overrides the permissiveness of the former.
We have held that an employment personnel policy which singles out pregnancy and childbirth for treatment different from that accorded other instances of physical or medical impairment or disability is prohibited by the Human Rights Law (Union Free School Dist. No. 6, Towns of Islip & Smith-town v New York State Human Rights Appeal Bd., 35 NY2d 371; Board of Educ. v New York State Div. of Human Rights, 35 NY2d 673; Matter of Board of Educ. v State Div. of Human Rights, 35 NY2d 675).[1] In each of these cases the employment was in the public sector and we concluded that a practice of differentiated treatment of pregnancy-related disability came within the statutory ban.
In the present cases we confront conceptually indistinguishable personnel practices but now for the first time the employment is in the private sector. This is said to call for a different consequence because the assertedly discriminatory practice is with respect to benefits within the ambit of the Disability Benefits Law (DBL), which is applicable to private but not to public employment. Under the DBL, disability "caused by or arising in connection with a pregnancy” is excepted from the minimum benefits mandated by that law (§ 205, subd 3). We are urged to hold that the provisions of the DBL rather than those of the Human Rights Law (HRL) establish the minimum performance to be required of private employers—in effect that compliance with the minimum standards of the DBL will excuse failure to comply with the mandate of the HRL. We reject this conclusion.
There is an evident incongruity between the DBL and the HRL, and the determinative issue is which law shall be held to be operatively controlling. Initially we note that the DBL (Workmen’s Compensation Law, art 9), adopted in 1949, was *87 enacted as socioeconomic legislation designed to assure economic support for working men and women temporarily unable to continue their employment because of sickness or injury unconnected with that employment, and thus to bridge the gap between workmen’s compensation and unemployment insurance (see Matter of Flo v General Elec. Co., 7 NY2d 96, 99; Report of Joint Legislative Committee on Industrial and Labor Conditions, NY Legis Doc, 1949, No. 67, p 44). The new statute fixed a floor, not a ceiling; it contained no prohibition against granting disability benefits in excess of those mandated by the DEL, thereby to supplement and to exceed the legislatively mandated minimum. Public employers were not required to conform to the requirements of the DEL (§ 201, subd 4) although they were authorized voluntarily to elect to be covered (§ 212, subd 2). Various factors, including considerations of the cost of providing benefits, went into the determination of benefit coverage and benefit levels (see Report of Joint Legislative Committee on Industrial and Labor Conditions, NY Legis Doc, 1949, No. 67, p 44).
In 1965 the Human Rights Law (Executive Law, art 15) was amended to prohibit discrimination in employment on account of sex. The new law laid down a blanket proscription applicable to all employers, public and private, with more than three employees (Executive Law, § 292, subd 5); its objective was quite different from, though not necessarily at odds with, the objective of the DEL. "It shall be an unlawful discriminatory practice * * * For an employer * * * because of the * * * sex * * * of any individual * * * to discriminate against such individual in compensation or in terms, conditions or privileges of employment.” (Executive Law, § 296, subd 1, par [a].)
In the effort to reconcile the HRL and the DEL much attention has been devoted in the courts below to the principle and mechanics of the so-called doctrine of "implied repeal”. In our view it advances neither analysis nor comprehension to treat the statutory relationship of the 1965 HRL to the 1949 DEL in the category of implied repeal. Indeed argument in that formulation has been abandoned by the Human Rights Division in our court. However the issue may be verbalized, the question is whether the earlier and still existing sections of the DEL now relieve private employers from the necessity of compliance with the mandate of the HRL. It does not have to be concluded that the HRL articulates a superior command, or that it reflects a worthier public policy than does the DEL; *88 it suffices if it be recognized that the HRL expresses a different command.
Analysis of the statutory predicament we confront may be aided by resort to another discipline and to the geometric concept of "skew lines”—two nonparallel lines which do not intersect however far extended and which accordingly do not lie in the same plane. So, too, here there is no collision between the HRL and the DEL; they pass each other without intersection.[2] Each law is cast in terms of minimum requirements, but from different perspectives. As in other instances of concurrent independent minima, one set of minimum requirements will be operative in one circumstance, the other set in another circumstance. That this is so involves no contradiction or logical difficulty. Thus, at present for employers with three or fewer employees, the operative minimum is only that of the DEL; for all others it is that of the HRL. Or by way of another perspective, if the HRL were to be repealed —a contingency realistically unthinkable, but perhaps illustratively useful—the DEL would once again become operative for all covered employment without the necessity of re-enactment. We do not hold, then, that the HRL struck down the DEL; rather in areas within the reach of both statutes the HRL rendered the DEL dormant. In sum, the DEL and the HRL each lay down minimum demands on employers. Whichever statute imposes the greater obligation is the one which becomes operative. In the cases before us it is the HRL.
To determine whether the DEL survived the enactment of the 1965 amendment to the HRL, or whether the latter impliedly repealed the former, or whether, as we hold, the two statutes are to be read together as resulting in the imposition of two concurrent independent minimum standards is no arrogation of a legislative prerogative. It is rather, whatever may be the outcome, the ordinary discharge of a familiar judicial responsibility. There can be no escape from what the dissent characterizes as the "ranking of statutes” if it is thereby intended to refer to the fact that the provisions of either the HRL or the DEL must be held to be operative. The *89 dissent would hold that the DBL sets the operative standard; we hold that in this instance it is the HRL.
The private employers argue that it is significant that the pre-existing differentiated treatment permitted with respect to pregnancy disabilities under the DBL was not prohibited by explicit provision in the 1965 amendment of the HRL. This contention misconceives the thrust and design of the HRL; it was intended as a blanket proscription. Surely it cannot be accepted that each discriminatory practice in use in 1965, whether existing by legislative grace or in consequence of employment custom or usage, should have been marked for explicit demise. Indeed, no discriminatory practice was identified—the very purpose of the HRL was by blanket description to eliminate all forms of discrimination, those then existing as well as any later devised. To contend that, absent explicit condemnation, any pre-existing discriminatory practice which might be said to have had legislative blessing prior to 1965 was assured continued acceptability would be largely to emasculate the new statute, intended as it was to eradicate all discrimination. What is significant is the fact that with the means so readily available to it the Legislature chose not to exempt the benefits commanded by the DBL from the prohibition of the HRL. That, as the dissent points out, there was specific tailoring with respect to certain exceptions underscores the point.
We agree with the dissent that there are differences, significant economic and policy differences, between public and private employment. We agree, too, that, absent issues of constitutional dimension (of which there are none with respect to the question now before us), the Legislature may take such differences into account in making different provision with respect to the two types of employment. Indeed that is what it did in the instance of disability benefit standards. Contrariwise, and this is critical in our view, this is precisely what the Legislature did not do when it enacted the Human Rights Law and particularly when in 1965 it added sex as an impermissible basis for discrimination. In the absence of a clearly expressed and explicitly manifested legislative intention we could not accept the conclusion that employees in the private sector are to be permitted to suffer discrimination from which employees in the public sector are protected.
It remains to make two other observations. In the first place, with an awareness of the realities of legislative activity *90 and inactivity and particularly the variety of reasons which may be ascribed thereto, we attach no determinative significance to the failure of persisting attempts at explicit legislative integration of these two statutes. Questionable as may be any reliance on legislative inactivity, we would distinguish instances in which the legislative inactivity has continued in the face of a prevailing statutory construction. Thus, "[wjhere the practical construction of a statute is well known, the Legislature is charged with knowledge and its failure to interfere indicates acquiescence” (Engle v Talarico, 33 NY2d 237, 242). Such is not the circumstance here, however, for it is not until the announcement of our decision in the present cases that there may be said to be a final judicial determination as to the operative relation between the Disability Benefits Law and the Human Rights Law, with respect to which future inactivity may someday arguably be said to be significant.
Second, we set aside the spectres of assertedly prohibitive cost predicted to accompany any provision of equal benefits for pregnancy-related disability. A court cannot responsibly be wholly indifferent to the economic impact likely to attend its decisions, but neither can the prospect of financial impact dictate the judicial outcome. We do not doubt that the eradication of sexual discrimination, as well as of impermissible discrimination in other categories, will normally be expensive at least in the short run. We would violate our judicial responsibility, however, were we to accept the proposition pressed on us by some that while implementation of the HRL may proceed apace where cost can be said to be acceptable, some erosion of the blanket prohibition must be tolerated where compliance may be expected to work serious economic distress. The very proper relevance of cost consideration enters the picture when determinations are to be made as to the particulars of implementation of the statutory mandate. In its presentation to us on these appeals the Human Rights Division acknowledged its awareness of very great responsibility in this regard.
Finally, entirely aside from the core issue in these cases as to whether the provisions of the DBL operate to cut back what would otherwise be the responsibility of the employers under the HRL, in two of the cases there was impermissible discrimination in the denial of sick leave, a benefit area outside the scope of the DBL. In both Brooklyn Union Gas and Crouse *91 Irving, the commissioner determined that denial of sick leave benefits constituted impermissible discrimination in the circumstances. Accordingly, quite apart from any question as to the impact of the DBL, the orders of the Human Rights Appeal Board should be sustained to the extent that payment of sick leave was directed.[3] In cases in which the DBL was not involved we have previously held that a personnel policy which singles out pregnancy and childbirth for treatment different from that accorded other forms of disability is prohibited by the HRL (see authorities cited, p 86).
In Brooklyn Union Gas and in American Airlines, the respective orders of the Appellate Divisions should be reversed, and the orders of the Human Rights Appeal Board confirmed; in Crouse-Irving the order of the Appellate Division should be affirmed.

. We are aware, of course, that the United States Supreme Court has recently reached a contrary result in construing title VII (§ 703, subd [a], par [1]) of the Federal Civil Rights Act of 1964 (US Code, tit 42, § 2000e-2, subd [a], par [1]; General Elec. Co. v Gilbert, 429 US 125). The pertinent provisions of that statute are substantially identical to those of section 296 of the Executive Law of the State of New York. The determination of the Supreme Court, while instructive, is not binding on our court as we now confront the contention of private employers that the provisions of our State’s Disability Benefits Law excuse their failure to conform to the standard that we have held our Human Rights Law demands of public employers.

. The situation would have been otherwise had the existing statute (the DBL), instead of setting a floor, contained provisions barring employers from treating pregnancy-related disabilities the same as nonj>regnancy-related disabilities. Then, indeed, the two statutes would have been repugnant. They could not have continued to exist side by side; one would have had to give way to the other.

. We were informed on the application for leave to appeal in Crouse-Irving that the complainant’s right to sick leave benefits was no longer at issue and that she had been paid such benefits.